[No. 9781–1–III.  Division Three.  April 23, 1991.]

THE STATE OF WASHINGTON, *Respondent*, v. BOBBIE DAN NORMAN, *Appellant*.

18

*Michael F. Keyes,* for appellant.

*Donald C. Brockett, Prosecuting Attorney,* and *Clark D. Colwell, Deputy,* for respondent.

SHIELDS, A.C.J.—Bobbie Dan Norman was convicted of first degree manslaughter for his refusal to provide medical care for his son, Aaron, which resulted in Aaron's death. Mr. Norman appeals, contending: (1) his actions were protected under the freedom of religion clause in the Washington State Constitution; (2) the court erred in its instructions to the jury; and (3) he received ineffective assistance of counsel. We affirm.

Mr. Norman and his wife, Judy, were members of a religious group known as the "No–Name Fellowship". The leaders of the group, known as "elders", were primarily Doug Kleber, who spent the majority of time in Illinois where he "spearheaded" another fellowship, and Jeff Siegel, who led the Spokane group. Both men, former athletes, were in their early thirties and had no formal religious training. The members of the group were taught only men could have positions of authority in the church, husbands ruled the households, and wives were to be totally submissive to their husbands. The members were also taught God spoke through the elders; therefore, failure to believe the word of the elders was a failure to believe the word of God. The members were taught to consult the elders whenever they had to make basic day–to–day decisions: whether to accept a job, purchase a car, or seek medical care.

During the 7 years the Normans were members of the group, the teachings became more rigid. Spanking became routine as a means of getting "right with God." All physical illness was thought to be caused by sin. Members were taught the medical establishment was "wicked" and members should rely on God to heal them. Members were basically taught to pray first, and then seek medical care as a

last resort.[1] Members were also taught that, as parents, they bore the primary responsibility for their children.

On Wednesday, December 16, 1987, Mr. and Ms. Norman noticed their 10-year-old son, Aaron, had begun losing weight and was drinking water and urinating excessively. Mr. Norman brought this to the attention of the leaders, including Mr. Kleber (visiting from Illinois), who prayed for Aaron during the Wednesday night church service. Several of the members suspected Aaron had diabetes, and one member informed Ms. Norman of this. She passed this information along to Mr. Norman.[2] Several members also informed Mr. Kleber and Mr. Siegel of their suspicions, but neither elder informed Mr. Norman. By Friday, December 18, Aaron began vomiting. Mr. Norman again called Mr. Kleber and Mr. Siegel, who, with other church leaders, went to the Norman house. Mr. Kleber determined the sin which was causing Aaron's illness was Ms. Norman's lack of submissiveness to her husband. Mr. Kleber therefore instructed Mr. Norman to spank her. Mr. Norman complied. Mr. Kleber also spanked Ms. Norman with Mr. Norman's acquiescence. On Saturday, Aaron's condition worsened. Mr. Norman again called Mr. Kleber, who, with Mr. Siegel and the other church leaders, again went to the Norman house. This time Mr. Kleber, Mr. Siegel and the church leaders decided it was Aaron who must be sinning. They had a "revelation" that the sin involved was masturbation. After they explained to Aaron what that term meant, Aaron denied it. Mr. Norman decided Aaron needed to be "spanked." After he spanked Aaron in a "frustrated" and "desperate" fashion, Mr. Kleber stepped in and demonstrated how to spank Aaron in a "controlled" manner. Mr. Norman then decided to spank Aaron with a wooden

---

[1]For example, in the summer of 1987, Aaron fell off his bicycle and broke his collarbone. After 10 to 12 days of praying and alternately petitioning the elders, the Normans were given permission to take Aaron to a doctor.

[2]Mr. Norman claimed he never heard her tell him this.

paddle. He spanked Aaron with the paddle over 14 times.[3]
After an hour of intense interrogation and spanking, Aaron
finally "confessed." At the end of this "ministering", Mr.
Kleber suggested Mr. Norman take Aaron to the hospital,
and stated the church would support Mr. Norman if he
made that decision. Mr. Norman refused, stating he would
take Aaron to the hospital if his condition worsened.
Throughout the night, Aaron's condition did in fact worsen.
Mr. Norman continued slapping Aaron and calling Mr.
Kleber for guidance. Mr. Kleber assured Mr. Norman that
Aaron would be all right. By morning Aaron was dead. He
was completely emaciated and weighed only 46 pounds. It
was determined he died of untreated juvenile diabetes. At
trial, the unrefuted medical testimony was Aaron's condi-
tion was exacerbated by the spankings, and Aaron could
have survived had he received medical attention as late as
Saturday.

Most of Mr. Norman's trial focused on the control the
elders and leaders of the group had on its members. Several
former members testified they experienced "mind control"
and were "brainwashed". Mr. Siegel contended the mem-
bers were not "controlled" or "brainwashed", but rather
were "influenced" and operated under a "deception." He
contended Mr. Norman was influenced, but not controlled.
Other former leaders likewise testified the members were
not controlled, but had freedom of choice. To substantiate
this claim, one of the leaders testified to his knowledge of a
long list of former members who had voluntarily left the
church, including the Normans' two older sons, Dan and
Chris. Mr. Kleber contended he did not control people, he
just had a "strong intense kind of personality". He claimed
Mr. Norman was free to make his own choices. In addition,
several of the former members who stated they felt "con-
trolled" admitted they could have disobeyed the leaders or

---

[3]It is apparent the word "spank", as used by Mr. Norman, is a euphemism.
The autopsy photographs revealed Aaron was extensively bruised, and numerous
imprints of a hole in the wooden paddle were also evident on Aaron's body.

voluntarily left the organization. Mr. Norman likewise admitted he had control over his own actions and was responsible for them.

It was also revealed Mr. Norman was a deacon in the church, but aspired to be elevated to the position of an elder. In order to do that, he had to have his "house in order": his wife had to be submissive and his children had to be in control. One witness testified Mr. Norman wanted "to please the elders of the church in every way he could." The jury found Mr. Norman guilty of first degree manslaughter.[4]

Mr. Norman first contends his conviction violates Const. art. 1, § 11.[5] He argues our constitution needs to be interpreted in the context of the common law which existed at the time of its adoption, and under that common law parents could not be convicted of manslaughter for refusing to render medical aid to their children because of their religious beliefs. He relies on *Regina v. Wagstaffe,* 10 Cox Crim. Cas. 530 (1868). He further claims Const. art. 1, § 11 provides greater protection than the United States Constitution; therefore, cases involving freedom of religion under the federal law are inapplicable to the case at hand.

A brief history of medical science in relation to religion is in order. Medical science was founded in Greece at least 500 years before the Christian era. After the adoption of Christianity by Rome and the conversion of Europe, "curing" illnesses by the interposition of Divine power commenced and was continued throughout Europe during the Middle Ages. However, by the middle of the 18th century, as a result of advancements in medicine and a change

---

[4]For their involvement in Aaron's death, Mr. Kleber and Mr. Siegel were convicted of second degree criminal mistreatment, a nonviolent crime.

[5]Const. art. 1, § 11 provides in part:

"Absolute freedom of conscience in all matters of religious sentiment, belief and worship, shall be guaranteed to every individual, and no one shall be molested or disturbed in person or property on account of religion; but the liberty of conscience hereby secured shall not be so construed as to excuse acts of licentiousness or justify practices inconsistent with the peace and safety of the state."

22

in public sentiment, practitioners of medicine began being called when individuals were sick, until it became regarded as a duty upon persons having the care of others to call upon medical assistance in case of serious illness. *See People v. Pierson,* 176 N.Y. 201, 68 N.E. 243, 245 (1903). This change in attitude is evident in the history surrounding *Regina v. Wagstaffe, supra.* Immediately after that case was decided, the English Parliament amended the law to provide that any parent who willfully neglected to provide adequate medical aid for his child would be guilty of an offense. For over a hundred years, it has been commonly accepted a parent has a duty to maintain his children, and this maintenance includes food, lodging, clothing, *medical attendance,* and education. *Pierson,* at 209. This duty has been referred to as a "natural" or even a "sacred" duty, and "a basic tenet of our society and law", *see State v. Williams,* 4 Wn. App. 908, 912, 484 P.2d 1167 (1971); *In re Hudson,* 13 Wn.2d 673, 687, 126 P.2d 765 (1942); *Lizotte v. Lizotte,* 15 Wn. App. 622, 626, 551 P.2d 137 (1976), and is generally recognized throughout this country. *See* 2 C. Torcia, *Wharton on Criminal Law* § 174, at 287 (14th ed. 1979).

Besides the fact this duty has long been acknowledged at common law, Mr. Norman's argument that *Regina v. Wagstaffe, supra,* is dispositive fails, because our common law is based on the common law of England, including the English statutes in force at the time of the Declaration of Independence, as adopted by the territorial law of 1863. This common law continues to be the law of this state, except so far as it is modified by our statutes. *In re Hudson, supra* at 685. Because *Regina v. Wagstaffe, supra,* was not decided until 1868, it was not part of the common law of England adopted by the territory. Further, while the breach of duty in a common law case of involuntary manslaughter had to amount to more than ordinary or simple negligence, the law in Washington was changed by former RCW 9.48.060, which deemed the crime of manslaughter committed if the death proximately resulted from simple or

ordinary negligence. *Williams,* at 912–13. RCW 9.48.060, in turn, was repealed in 1975 to create two degrees of manslaughter: recklessly causing the death of another, RCW 9A.32.060, and with criminal negligence causing the death of another, RCW 9A.32.070.

Mr. Norman's argument the penal statute violates his free exercise of religion is one that has been addressed and dismissed by numerous courts across the land. The *Pierson* court, interpreting a state constitutional provision similar to our own, held the failure to provide medical care to an ailing child was an act which was inconsistent with the peace and safety of the state. *Pierson,* at 211, stated, "The peace and safety of the state involves the protection of the lives and health of its children as well as the obedience to its laws. Full and free enjoyment of religious profession and worship is guaranteed, but acts which are not worship are not." In *Prince v. Massachusetts,* 321 U.S. 158, 166–67, 88 L. Ed. 645, 653, 64 S. Ct. 438, *reh'g denied,* 321 U.S. 804, 88 L. Ed. 1090, 64 S. Ct. 784 (1944), the Supreme Court stated, "The right to practice religion freely does not include liberty to expose the . . . child to . . . ill health or death." The Court also stated, "Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves." *Prince,* 321 U.S. at 170; *see also Commonwealth v. Barnhart,* 345 Pa. Super. 10, 497 A.2d 616 (1985), *cert. denied,* 488 U.S. 817 (1988).

Mr. Norman's claim we are precluded from looking at interpretations of the first amendment to the United States Constitution in interpreting our own religious freedom clause is unsupported by authority and contradicts this State's history of doing so. *See Backlund v. Board of Comm'rs of King Cy. Hosp. Dist. 2,* 106 Wn.2d 632, 640, 724 P.2d 981 (1986), *appeal dismissed,* 481 U.S. 1034 (1987); *Sumner v. First Baptist Church,* 97 Wn.2d 1, 639 P.2d 1358 (1982); *State v. Clifford,* 57 Wn. App. 127, 787

24

P.2d 571, *review denied,* 114 Wn.2d 1025 (1990). In *Backlund,* at 641–42, our Supreme Court noted religious freedom can be restricted to prevent grave and immediate danger to interests which the State may lawfully protect; conduct motivated by religious beliefs may be subject to regulation if that conduct conflicts with the exercise of the interest of third parties; and, in the area of health and safety, governmental interests often override individual objections to regulations relating thereto. *Backlund,* at 639 (quoting Justice Douglas in *United States v. Ballard,* 322 U.S. 78, 86–87, 88 L. Ed. 1148, 64 S. Ct. 882 (1944)) noted, "'Thus the [First] Amendment embraces two concepts,— freedom to believe and freedom to act. The first is absolute but, in the nature of things, the second cannot be.'" *Backlund* refers to several federal cases which hold a state can require vaccinations, blood transfusions, X–rays, and cancer treatment though contrary to an individual's religious belief. Other states have also found in favor of a state's limitation of free exercise of religion when a child needs medical care and a parent believes healing is only possible through prayer. *See In re Hamilton,* 657 S.W.2d 425 (Tenn. Ct. App. 1983) and cases cited therein. Here, Mr. Norman was free under the Washington State Constitution to believe Aaron could be healed through prayer. He was not free to act on that belief in a manner jeopardizing the health of his child. We find no constitutional violation.

Next, Mr. Norman contends the court erred in giving instruction 7.[6] He claims instruction 7 was based upon *State v. Williams, supra,* which involved a different statute

---

[6]Instruction 7 provided:

"You are instructed that a parent has a duty to provide medical care for a dependent child. The duty is activated at the time when an ordinarily prudent person, solicitous for the welfare of his or her child and anxious to promote its recovery, would deem it necessary to call in medical assistance. If this duty is breached the breach must be shown to be reckless, or criminal negligence, as defined in these instructions, to support first or second degree manslaughter respectively."

than that under which Mr. Norman was charged. He additionally claims the instruction fell short of properly advising the jury, because it implies Mr. Norman's acts need only have created an unreasonable risk rather than a substantial one. Further, he claims the instruction did not inform the jury Mr. Norman needed to be aware of the risk, and that his conduct needed to be evaluated in light of whether it was a gross deviation from what a person would do with the same religious belief as Mr. Norman.

In his defense, Mr. Norman testified he believed the elders were basically spokesmen for God, and he felt obligated to obey them. Because Mr. Norman raised this issue of his perceived duty to church and God, the court instructed the jury as to Mr. Norman's duty vis–a–vis his child. The first sentence of instruction 7, which is arguably taken from the *Williams* case, states that parental duty. However, the rest of the instruction properly advises the jury what must be established before first or second degree manslaughter can be found. Under the prior manslaughter statute, former RCW 9.48.160, and the rule in *Williams,* ordinary negligence, caused by a failure to use "ordinary caution", and which proximately caused the death of a victim, constituted manslaughter. *Williams,* at 913. This is no longer true. Now RCW 9A.32.060 requires a reckless act and RCW 9A.32.070 requires a criminally negligent act, before manslaughter can be found. Instruction 7 properly advised the jury of those requirements.

■ Further, "[i]nstructions must be considered as a whole and if, when so considered, they properly state the law, they are sufficient." *State v. Wanrow,* 88 Wn.2d 221, 246, 559 P.2d 548 (1977); *see also State v. Fernandez,* 28 Wn. App. 944, 954, 628 P.2d 818 (1980). In addition to instruction 7, instruction 8 read:

> To convict the defendant of First Degree Manslaughter or Second Degree Manslaughter you must find beyond a reasonable doubt he acted either recklessly or with criminal negligence as defined in these instructions.
> . . . .

Proof of ordinary negligence alone will not support a conviction for either First or Second Degree Manslaughter.

Instructions 4 and 5 also advised the jury his conduct needed to be reckless and his recklessness had to be the cause of Aaron's death. Instruction 9, which is a direct quote from RCW 9A.08.010 read:

A person is reckless or acts recklessly when a person knows of and disregards a *substantial* risk that a wrongful act may occur and the person's disregard of such substantial risk is a gross deviation from conduct that a reasonable man would exercise *in the same situation.*

(Italics ours.)

▇ The instructions, when read as a whole, did advise the jury that recklessness needed to be found, that Mr. Norman's acts had to have created a substantial risk, and that his conduct needed to be evaluated in light of what a reasonable person in his situation would do. We find no error.

Finally, Mr. Norman contends he was not provided effective assistance of counsel because his counsel at trial as a matter of strategy did not present the defense of diminished capacity to the jury.[7] He argues because he had been a member of a religious group for over 7 years and was totally dependent on the elders for direction, this defense should have been presented. In his pro se brief, Mr. Norman reiterates his argument he was totally dependent on the group's leadership, and he "had to" do what they told him.

---

[7]The defense of diminished capacity negates not only "intent" but "knowledge". *State v. Edmon,* 28 Wn. App. 98, 104, 621 P.2d 1310, *review denied,* 95 Wn.2d 1019 (1981). Diminished capacity has been successfully applied in cases involving paranoid schizophrenia, *State v. Griffin,* 100 Wn.2d 417, 670 P.2d 265 (1983); *State v. Thamert,* 45 Wn. App. 143, 723 P.2d 1204, *review denied,* 107 Wn.2d 1014 (1986); intoxication, *State v. Thomas,* 109 Wn.2d 222, 743 P.2d 816 (1987); *State v. Hutchinson,* 111 Wn.2d 872, 880, 882, 766 P.2d 447 (1989); and anxiety and depression, *State v. Edmon, supra.* The superficial treatment of diminished capacity in both parties' briefs does not discuss or address the extension of the diminished capacity defense to the culpability levels of recklessness, RCW 9A.08.010(1)(c), or criminal negligence, RCW 9A.08.010(1)(d), and no cases found have done so. We decline to consider this unaddressed issue.

He claims he did not act autonomously, but through a reactive maladaptive behavior pattern which meets diagnostic criteria for a mental disorder. *State v. Griffin,* 100 Wn.2d 417, 670 P.2d 265 (1983), on which he relies, involved the crime of forgery. There, the court held the expert testimony at trial of a clinical psychologist indicating the defendant suffered from a catatonic type of paranoid schizophrenia as well as chronic alcoholism, required an instruction on diminished capacity, because an instruction on the elements of forgery and an instruction on intent did not suffice. *Griffin,* at 418–19, stated:

> Diminished capacity instructions are to be given whenever there is substantial evidence of such a condition and such evidence logically and reasonably connects the defendant's alleged mental condition with the inability to possess the required level of culpability to commit the crime charged.

There was no expert evidence presented at trial Mr. Norman suffers from a reactive maladaptive behavior pattern, nor that such a pattern meets diagnostic criteria for a mental disorder. Further, the record does not suggest it. As the Supreme Court recently stated in *State v. Crane,* 116 Wn.2d 315, 335, 804 P.2d 10 (1991), review of a case on appeal is limited to matters in the record. The Court of Appeals noted in *State v. Humburgs,* 3 Wn. App. 31, 36–37, 472 P.2d 416 (1970), when faced with contentions concerning matters not in the record:

> The contentions now made would require us to make a determination of the truth of defendant's ex parte post trial claims concerning matters occurring out of court. For all we know, an evidentiary hearing would disclose that the defendant's present statements are controverted and that the decisions made concerning trial management were tactical decisions of trial counsel in discharge of his duty to best represent the defendant. If there be a basis for the claims now made in an effort to show that, after considering the entire record, the accused was denied a fair and impartial trial, that basis must be established in a separate proceeding, the merits of which we do not prejudge.

(Citations omitted.) Therefore, with respect to matters outside the record about which Mr. Norman complains, the only remedy is to bring an independent proceeding by way

28

of personal restraint petition under RAP 16.3. *State v. King*, 24 Wn. App. 495, 505, 601 P.2d 982 (1979).

The testimony at trial concerning the issue of whether Mr. Norman and other followers were "controlled" or "brainwashed" by the group's leaders was in conflict. Several former members of the group testified they operated out of fear. As stated in *State v. Edmon*, 28 Wn. App. 98, 621 P.2d 1310, *review denied*, 95 Wn.2d 1019 (1981), fear is not a mental disorder. Moreover, even some of the witnesses who testified on behalf of the defense and claimed they were "controlled" admitted they voluntarily left the organization of their own accord, or sought medical advice even though they knew the leadership disapproved. The Normans themselves had sought medical treatment for Aaron just a few months prior to this incident. Further, Mr. Norman admitted he was in control of the situation and was responsible for what happened. The leaders of the group told him the Saturday afternoon before Aaron's death they would support a decision to take Aaron to the hospital. Mr. Norman nevertheless *chose* not to do so.

Essentially, in the absence of evidence of mental illness or disorder, Mr. Norman argues his religious belief operates as a defense to this homicide. There are two defenses to homicide: justifiable homicide and excusable homicide. Justifiable homicide is defined as that which is committed in self–defense or in defense of another. RCW 9A.16.020; WPIC 16.02 (Supp. 1986). It is inapplicable here. Excusable homicide[8] is defined as that which is "committed by accident or misfortune in doing any lawful act by lawful means, without criminal negligence, or without any unlawful intent." RCW 9A.16.030; WPIC 15.01 (Supp. 1986). An excusable homicide defense by definition is not available to a defendant who acts recklessly or with criminal negligence, even if otherwise acting lawfully in the exercise of religious belief. The jury in this case was properly instructed it could

---

[8]No objection at trial or on appeal has been made to instruction 4, which did not advise the jury of this defense.

find Mr. Norman guilty of second degree manslaughter if it found he acted with criminal negligence, or first degree manslaughter if he acted recklessly. The jury returned a verdict of first degree manslaughter, thereby indicating its belief Mr. Norman's acts did not constitute an excusable homicide.

The test for determining whether defendant's counsel was ineffective is set out in *State v. Fleck*, 49 Wn. App. 584, 588, 744 P.2d 628 (1987), *review denied*, 110 Wn.2d 1004 (1988): (1) whether counsel's performance fell below an objective standard of reasonableness, and (2) whether this deficiency prejudiced the defendant. Failure of a strategy to gain acquittal is insufficient to constitute ineffective assistance of counsel. *State v. Bradford*, 56 Wn. App. 464, 471, 783 P.2d 1133 (1989). Mr. Norman's counsel's defense did not fall below an objective standard of reasonableness, and there was no deficiency which prejudiced Mr. Norman.

The decision of the Superior Court is affirmed.

MUNSON and THOMPSON, JJ., concur.

Reconsideration denied June 13, 1991.