IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 32017-1-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FRANK UHYREK, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, C.J. — Frank Uhyrek raises four challenges to the terms of the

judgment and sentences entered on multiple convictions resulting from his November

2011 robbery of a Spokane supermarket. In a pro se statement of additional grounds, he

makes numerous complaints about the conduct of trial.

He correctly argues that his conviction for unlawfully displaying a weapon merged

into his convictions for robbery and attempted robbery and must be set aside. He also

demonstrates that the court imposed an impermissibly variable term of community

custody. He demonstrates no other error or abuse of discretion. We affirm Mr. Uhyrek's

convictions but remand for resentencing.

FACTS AND PROCEDURAL BACKGROUND

Around 5:00 p.m. on November 1, 2011, Frank Uhyrek entered a Spokane

supermarket where he donned a ski mask, wielded a large knife, and approached four

employees working at check stands, one by one, demanding money from the cash registers at which they were stationed. Two employees were unable to comply with his demand—one because an intervening customer blocked her access; the other because she was so frightened she "could not think straight." Report of Proceedings (RP) at 183. Two others opened their registers and allowed Mr. Uhyrek to take what amounted to a total of about $400.

After collecting what he could, Mr. Uhyrek ran out of the supermarket, chased by three customers for about a block and a half, where Mr. Uhyrek got into a waiting car whose driver immediately drove off. Several witnesses were able to describe the getaway car and provide the license plate number, which police officers determined was registered to an individual named Charles Stanfield.

The next morning, after Spokane police officers were briefed about the robbery, Office Glen Bartlett located Mr. Stanfield's car at a Spokane motel which he knew to be frequented by offenders. He watched the parking lot from his unmarked car for a time and, on seeing a man get into the car and begin driving away, he and other officers with whom he was in contact followed the Stanfield car, eventually blocking it when the driver parked in the lot of a nearby business. Officer Bartlett informed the driver that the car had been reported as involved in a crime, handcuffed him, and obtained his agreement to speak with police. The driver turned out to be Mr. Stanfield.

2

Based on information provided by Mr. Stanfield, officers went back to the motel and surveilled it, eventually locating and arresting Mr. Uhyrek. He was charged with two counts of first degree robbery, two counts of attempted first degree robbery, and one count of unlawfully displaying a weapon. Each robbery count included a deadly weapon enhancement as provided by RCW 9.94A.825. The State also alleged as an aggravating circumstance that the defendant "has committed multiple current offenses and the defendant's high offender score results in some of the current offenses going unpunished" as provided by RCW 9.94A.535(2)(c). Clerk's Papers (CP) at 109-10.

Before trial, Mr. Uhyrek filed a motion to suppress evidence of the clothes he was wearing and other items on his person at the time of his arrest, contending that law enforcement had "burst into" a motel room in which he was a guest absent exigent circumstances. CP at 5. The trial court denied the motion. It found, among other facts, that when Mr. Stanfield was stopped, he told officers he had been involved in the supermarket robbery and that the person who actually committed the robbery, identified by him only as "Frank," had checked out of the motel but was still at the motel location; that officers thereafter saw a man fitting Mr. Uhyrek's description enter room #138 of the motel; that officers knocked at the door of room #138 and were admitted by Gregory Finch, who said he was the sole renter of the room and gave the officers permission to enter; that officers saw Mr. Uhyrek make "furtive movements with his hands" and begin walking toward the rear of the room; and that officers were concerned that Mr. Uhyrek

3

would walk from their view to a location where he might obtain a knife or a weapon. CP at 104-05.

Based on those and other findings, the trial court concluded that "[t]here was an objective reasonable belief, based on [Mr. Uhyrek's] furtive movements inside the motel room in conjunction with the information gathered by officers, that the defendant may have been involved in several armed robberies the day before, that he was potentially armed and dangerous." CP at 108. It found that the arresting officers' actions were warranted and denied the motion to suppress.

At trial, the State's evidence included surveillance video from the supermarket, the testimony of eyewitnesses, the testimony of a video forensic analyst who had compared the clothing of the robber as captured by the supermarket's surveillance cameras with the clothing worn by Mr. Uhyrek at the time of his arrest, and a ski mask and gloves found in a search of Mr. Stanfield's car, which a State expert testified bore DNA[1] that was a match with Mr. Uhyrek.

Mr. Uhyrek testified in his own defense. He blamed Mr. Stanfield for the robbery, telling the jury that while he had driven around with Mr. Stanfield on the day of the robbery, Mr. Stanfield dropped him off sometime before the robbery took place. He testified that in the evening after the robbery occurred, he met up with Mr. Stanfield and

---

[1] Deoxyribonucleic acid.

4

borrowed Mr. Stanfield's clothing—hence the similarity between the clothes he was wearing when arrested and those Mr. Stanfield wore in committing the robbery. His theory at trial was that the witnesses of the robbery, having limited ability to identify the robber given the ski mask, mistook him for Mr. Stanfield. A defense expert testified that the DNA samples found on the ski mask and the gloves might have been contaminated with the DNA taken from Mr. Uhyrek for comparison.

The jury found Mr. Uhyrek guilty as charged and returned special verdicts finding that he was armed with a deadly weapon at the time he committed the robberies and attempted robberies.

The trial court imposed an exceptional sentence, ordering that each of the robbery convictions, which it found "involved separate and distinct courses of conduct," be served consecutively based upon its finding that Mr. Uhyrek committed multiple current offenses and that his high offender score of 16 would otherwise result in some of the current offenses going unpunished. CP at 483. The court ordered that the sentences for the four robbery counts run concurrent to the unlawful display of a weapon count.

The court also sentenced Mr. Uhyrek to community custody. The judgment and sentence states, with respect to community custody, that "[t]he defendant shall be on community custody for the longer of: (1) the period of early release . . . or (2) the period imposed by the court." CP at 492. The court imposed a $100 DNA collection fee.

Mr. Uhyrek appeals.

ANALYSIS

Mr. Uhyrek assigns error on appeal to (1) the conviction for unlawfully displaying a weapon, which he contends merges with the first degree robbery convictions, (2) the treatment of the four first degree robbery convictions as constituting separate and distinct courses of conduct, which he argues improperly increased his offender score and provided a basis for the exceptional consecutive sentences, (3) the indeterminate nature of the sentence to community custody, and (4) the imposition of a DNA fee where the Washington State Patrol Crime Laboratory already had a DNA sample from Mr. Uhyrek taken in connection with prior felony convictions.

We address the assignments of error in turn.

*Application of the merger doctrine*

Mr. Uhyrek contends his conviction for unlawfully displaying a weapon merges with his first degree robbery convictions. The merger doctrine is a rule of statutory construction that applies where the legislature "has clearly indicated that in order to prove a particular degree of crime, 'the State must prove not only that the defendant committed that crime but that the crime was accompanied by an act which is defined as a crime elsewhere in the criminal statutes.'" *State v. Parmelee*, 108 Wn. App. 702, 710, 32 P.3d 1029 (2001) (quoting *State v. Frohs*, 83 Wn. App. 803, 806, 924 P.2d 384 (1996)). In other words, where a defendant has been found guilty of more than one crime, the convictions may merge if the court determines the legislature intended only one

punishment for a single act. In that event, the conviction of the lesser offense must be set aside, as it is merged or included in the conviction of the greater. *State v. Zumwalt*, 119 Wn. App. 126, 133, 82 P.3d 672 (2003).

Mr. Uhyrek was charged with first degree robbery and attempted first degree robbery on the basis that he was armed with a deadly weapon. The State concedes that case law supports Mr. Uhyrek's position that the crime of unlawfully displaying a weapon merges into the robberies and attempted robberies under these circumstances. *Cf. State v. Workman*, 90 Wn.2d 443, 448, 584 P.2d 382 (1978) ("It is clear that the element of carrying a weapon under RCW 9.41.270, the gross misdemeanor, is a necessary element of the greater crime of first-degree robbery."). The State nonetheless argues that because merging the gross misdemeanor into the felony will not change Mr. Uhyrek's offender score and the trial court ordered that the sentence for the unlawful display charge would run concurrently, the error is harmless.

A conviction for a lesser offense that should merge "does not evaporate simply because of the concurrence of the sentence. The separate *conviction,* apart from the concurrent sentence, has potential adverse collateral consequences that may not be ignored. . . . [T]he second conviction, even if it results in no greater sentence, is an impermissible punishment." *Ball v. United States*, 470 U.S. 856, 864-65, 105 S. Ct. 1668, 84 L. Ed. 2d 740 (1985); *Frohs*, 83 Wn. App. at 811, n.2. Given Mr. Uhyrek's lengthy history of felony convictions and high offender score, we recognize that one

7

more conviction (and for a gross misdemeanor) is unlikely to have material consequences. It is an impermissible punishment, however, requiring that we remand with directions to vacate it.

### Same criminal conduct

Mr. Uhyrek next contends that the trial court erred in treating his four robbery convictions separately for purposes of determining his offender score because they constituted the same criminal conduct. A trial court's finding that the offenses constitute the same criminal conduct is reviewed for abuse of discretion. *In re Pers. Restraint of Toledo-Sotelo*, 176 Wn.2d 759, 764, 297 P.3d 51 (2013).

A defendant's current offenses must be counted separately in determining the offender score unless the trial court finds that some or all of them "encompass the same criminal conduct." RCW 9.94A.589(1)(a); *State v. Anderson*, 92 Wn. App. 54, 61, 960 P.2d 975 (1998). "Same criminal conduct" is defined as "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." RCW 9.94A.589(1)(a) (internal quotation marks omitted).

Mr. Uhyrek argues that contrary to the charging document, which identified the "victims" of the robberies as the four employees whom Mr. Uhyrek demanded open their cash registers, the true victim of all four robberies was the corporate owner of the supermarket: the money in the cash registers was the corporation's, and it was the corporation's money, not the individuals' money, that Mr. Uhyrek was after. For that

reason, and because the time, place and intent associated with all four robberies was the same, he contends that the robberies should have been counted as one offense. Br. of Appellant at 10-11.

A similar argument was rejected in the context of a double jeopardy challenge in *State v. Rupe*, 101 Wn.2d 664, 693, 683 P.2d 571 (1984). The defendant in *Rupe* was convicted of two counts of aggravated first degree murder and two counts of first degree robbery after he shot and killed two bank tellers during the course of a robbery. *Id.* at 667-69.

Our Supreme Court held that the defendant's multiple convictions for robbery were valid under RCW 9A.56.190, the statute which defines robbery. *Id.* at 693. Under RCW 9A.56.190, a person commits robbery when he "unlawfully takes personal property from the person of another or in his or her presence against his or her will by the use or threatened use of immediate force, violence, or fear of injury to that person or his or her property or the person or property of anyone." As the court explained:

> Robbery has several distinct elements: the taking of the personal property and the use or threat to use force on an individual. *The statute does not require that the person from whom the property is taken own that property. Possession or custody will suffice.* Here, each teller was individually responsible for money in her till. Each had control and possession of that money and each had the money taken by the use of force. These facts constitute two separate robberies and the double convictions do not place defendant in double jeopardy.

101 Wn.2d at 693 (emphasis added).

Similarly, in an appeal in which the proper unit of prosecution for robbery was contested, the court in *State v. Tvedt*, 153 Wn.2d 705, 720, 107 P.3d 728 (2005) explained that the "unit of prosecution" for robbery encompasses "both a taking of property and a forcible taking against the will of the person from whom or from whose presence the property is taken." Therefore, "a conviction on one count of robbery may result from *each separate taking of property from each person*," although multiple counts may not be based on "multiple items of property taken from the same person at the same time," nor on "a single taking of property from or from the presence of multiple persons even if each has an interest in the property." *Id.* (emphasis added). The court further explained that while "a robber's use or threatened use of force against an individual must be coupled with the taking of that individual's property," this includes "property over which he has an ownership, representative, or possessory interest." *Id.* at 724, n.4.

Both cases compel the conclusion that each supermarket employee, although not the owner of the currency in his or her assigned cash register, was a possessor or custodian of that currency and thereby a victim of robbery or attempted robbery. The robberies and attempted robberies do not constitute the same criminal conduct under RCW 9.94A.589(1)(a). The trial court did not err.

*Variable term of community custody*

Mr. Uhyrek next contends that the sentencing court erred in imposing a variable term of community custody contingent on the amount of earned early release.

10

A trial court's sentencing authority is limited to that authorized by statute. *State v. Albright*, 144 Wn. App. 566, 568, 183 P.3d 1094 (2008) (citing *In re Postsentence Review of Leach*, 161 Wn.2d 180, 184, 163 P.3d 782 (2007)). Former RCW 9.94A.715 allowed courts to impose variable terms of community custody. Under the former statute, it was possible for sentencing courts to make what came to be called a *Brooks* notation in a judgment and sentence, indicating that the combined terms of confinement and community custody, while variable, "shall not exceed the statutory maximum." *In re Pers. Restraint of Brooks*, 166 Wn.2d 664, 675, 211 P.3d 1023 (2009).

The legislature repealed that statute in 2008 in favor of fixed terms of community custody. LAWS OF 2008, ch. 231, § 57; LAWS OF 2009, ch. 28, § 42. Mr. Uhyrek is correct that, under the amended statute applicable to him, "a court may no longer sentence an offender to a variable term of community custody contingent on the amount of earned release but instead, it must determine the precise length of community custody at the time of sentencing." *State v. Franklin*, 172 Wn.2d 831, 836, 263 P.3d 585 (2011); *State v. Boyd*, 174 Wn.2d 470, 472, 275 P.3d 321 (2012). RCW 9.94A.701, applicable to Mr. Uhyrek's felonies, provides in relevant part:

> A court shall, in addition to the other terms of the sentence, sentence an offender to community custody for eighteen months when the court sentences the person to the custody of the department for a violent offense that is not considered a serious violent offense.

RCW 9.94A.701(2).

11

There are ways under the current statute that a sentencing court can impose a fixed term of community custody and at the same time recognize the Department of Corrections' authority to transfer the earned early release of certain offenders into community custody. *See State v. Bruch*, 182 Wn.2d 854, 346 P.3d 724 (2015). But the "longer of early release or term imposed by the court" approach reflected in Mr. Uhyrek's judgment and sentence is impermissibly variable.

The State essentially concedes that there is a problem with the community custody sentence but makes the completely untenable suggestion that we should ignore the words "for the longer of" and treat the community custody provision as simply identifying two alternatives, one of which will happen. We cannot simply ignore the plain language of an erroneous judgment and sentence. On remand, the court is directed to impose a fixed term of community custody.

### DNA collection fee

Finally, Mr. Uhyrek contends that the sentencing court erred in imposing a $100 DNA collection fee as part of his mandatory legal financial obligations because, he represents, the Washington State Patrol Crime Laboratory already has a DNA sample from him by virtue of earlier felonies in which a sample would have been required. While RCW 43.43.754(1)(a) states that "[a] biological sample must be collected for purposes of DNA identification analysis from . . . [e]very adult or juvenile individual convicted of a felony," the statute provides in subsection (2) that "[i]f the Washington

12

state patrol crime laboratory already has a DNA sample from an individual for a qualifying offense, a subsequent submission is not required to be submitted." RCW 43.43.754(2).

In *State v. Thornton*, 188 Wn. App. 371, 642 P.3d 642 (2015), this court pointed out that the DNA collection fee is imposed by a different statute, RCW 43.43.7541, which plainly and unambiguously provides that "[e]very sentence imposed for a crime specified in RCW 43.43.754 must include a fee of one hundred dollars," making the fee "mandatory for all such sentences." *Id.* at 374-75. "The statute furthers the purpose of funding for the state DNA database and agencies that collect samples." *Id.* at 375. The fact that a subsequent DNA sample may not be required to be submitted to the state patrol is irrelevant to the mandatory imposition of the fee.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds for review (SAG), Mr. Uhyrek raises eight.

*Motion to suppress.* Mr. Uhyrek challenges the trial court's denial of his motion to suppress. He attacks the court's decision but without any reference to the basis on which we consider such challenges: on review of an order denying a motion to suppress, we will determine only whether substantial evidence supports the trial court's findings of fact and whether its findings of fact support its conclusions of law. *State v. Mendez*, 137 Wn.2d 208, 214, 970 P.2d 722 (1999), *abrogated in part on other grounds by Brendlin v.*

13

*Cal.*, 551 U.S. 249, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007). Substantial evidence exists when there is a sufficient quantity of evidence to persuade a fair-minded, rational person that a finding is true. *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). We review only those findings to which an appellant assigns error. *Id.* Unchallenged findings are verities on appeal. *Id.*

Mr. Uhyrek does not identify any finding of fact to which he assigns error. Nor does he explain the insufficiency of evidence at the suppression hearing (as distinguished from the evidence at his trials) that make the findings erroneous.

Beyond requirements that are specific to challenging denial of a motion to suppress, we will not consider a defendant's statement of additional grounds if it does not inform us of the nature and occurrence of alleged errors. RAP 10.10(c). We are not obligated to search the record in support of claims made in a defendant's statement of additional grounds for review. *Id.* For both reasons, Mr. Uhyrek's first ground is insufficient to permit review.

*Perjury of state's witness.* Mr. Uhyrek argues that police officer Michelle Madsen made false statements during her trial testimony. Specifically, he contends she falsely testified as to how she handled evidence, inconsistent with the proof presented at Mr. Uhyrek's first trial, which ended in a mistrial. This issue involves factual allegations outside the record of this appeal. If Mr. Uhyrek wishes to seek relief, it must be by

personal restrain petition. *State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159

(1991); *State v. Alvarado*, 164 Wn.2d 556, 569, 192 P.3d 345 (2008).

*Mug shot.* Mr. Uhyrek argues that he was prejudiced by the fact that his mug shot

was presented to the jury. He also takes issue with the fact that the video forensic analyst

used Adobe Photoshop software in working with the supermarket's surveillance footage,

that the footage was blurry, and that the lead detective asserted that Mr. Uhyrek had lost

weight since the time of his arrest without substantiating that assertion. Although Mr.

Uhyrek is not required to cite to the record in a SAG, he must inform the court of the

"nature and occurrence of alleged errors." RAP 10.10(c). Because he has failed to do

this, we decline to consider this argument.

*Richard Foxley's perjury and misidentification/jury of peers.* Mr. Uhyrek argues

that he was prejudiced when one of the State's witnesses, Richard Foxley, testified that

the robber was African-American, but later admitted he originally told police he thought

the robber was Caucasian. Further, when asked who he thought most resembled the

robber out of a photo lineup, Mr. Foxley pointed to a white male—someone other than

Mr. Uhyrek. Mr. Uhyrek claims he was prejudiced by Mr. Foxley's "racially

inflammatory lies." SAG at 12. He also states that even without Mr. Foxley's

statements, the cards were stacked against him because he was not provided a jury of his

peers.

The record reflects inconsistency in Mr. Foxley's description of the robber. But defense counsel was able to call the jury's attention to the discrepancy, and did so during closing argument.

With respect to the jury issue, Mr. Uhyrek presents no evidence that any juror was struck on an impermissible basis, nor does he otherwise explain the nature of the alleged error. We will not consider a SAG "if it does not inform the court of the nature and occurrence of alleged errors." RAP 10.10(c).

*Insufficient evidence of Ms. Lorentzen's cut.* Mr. Uhyrek next challenges testimony provided by Kathy Lorentzen, one of the employee-victims of attempted robbery, as to a cut she allegedly sustained during the robbery. Ms. Lorentzen testified that she was not sure where the cut came from, but that it could only have come from the robber's knife.

Mr. Uhyrek was not prevented from cross-examining or arguing the uncertain basis for her belief. There was no error.

*Reference to key chain knife.* Mr. Uhyrek argues that the State did not enter into evidence a small pocket key chain knife found on his person at the time of his arrest. He notes that the blade on the knife was less than three inches long and would not have been considered a deadly weapon. According to Mr. Uhyrek, the prosecutor asked a testifying officer to identify the knife, even though it was not admitted as an exhibit before the identification or after.

16

Mr. Uhyrek does not provide a citation to the record for the improper identification of the knife. Officer Jason Uberuaga did testify that he found a "small knife" hanging from Mr. Uhyrek's belt loop after he took him into custody. RP at 371. Mr. Uhyrek was not prevented from cross-examining the officer or arguing that the State had not demonstrated any connection between the small knife and the robbery.

Moreover, the trial court instructed the jury that it could only consider the testimony of the witnesses and the exhibits admitted into evidence. We presume that the jury followed the court's instructions. *State v. Pastrana*, 94 Wn. App. 463, 480, 972 P.2d 557 (1999), *abrogated in part on other grounds by State v. Gamble*, 154 Wn.2d 457, 114 P.3d 646 (2005).

*Mr. Uhyrek's Letter to Co-Defendant.* Mr. Uhyrek claims the trial court erred in allowing the State to offer in evidence and read to the jury portions of a letter he wrote and initially intended to mail to Mr. Stanfield, but ultimately decided not to mail. Defense counsel argued that the letter must have been taken by someone from Mr. Uhyrek's belongings and moved to exclude it on violation of privacy grounds.

The court denied Mr. Uhyrek's motion to exclude the letter but ruled that the State could only use it for impeachment. Mr. Uhyrek demonstrates no error in the court's ruling that in the context of the jail setting, Mr. Uhyrek did not enjoy a right of privacy in non-legal mail. Because Mr. Uhyrek agrees that he wrote the letter, the trial court

properly concluded that the letter was admissible as an admission by a party opponent, and therefore was non-hearsay. ER 801(2).

*Certificate of compliance.* Finally, Mr. Uhyrek argues that his attorney did not always comply with an order setting forth standards for indigent defense and certifications of compliance, which requires the submission of quarterly notices. This issue involves factual allegations outside the record of this appeal. If there is some relief this court can order that Mr. Uhyrek believes is warranted, he must pursue it by personal restraint petition. *Norman*, 61 Wn. App. at 27-28.

We affirm the convictions and remand for resentencing consistent with this opinion.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, C.J.

WE CONCUR:

_____
Korsmo, J.

_____
Fearing, J.