IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  34655-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DESHAWN ISAIAH ANDERSON, | ) | UNPUBLISHED OPINION |
| A.K.A.: DESHAWEN ISAIAH | ) | |
| ANDERSON, | ) | |
| Appellant. | | |

SIDDOWAY, J. — DeShawn Anderson appeals what is effectively a lifetime sentence imposed for charges arising out of his multiple-victim assault with a firearm and later a murder, both of which took place in a several week period.  All were grudge and retaliation crimes committed by Mr. Anderson shortly after he turned 18.

We reject his arguments that the trial court failed to recognize that youth can be a mitigating factor supporting an exceptional downward sentence and that his trial lawyer provided ineffective assistance by failing to advocate for such a sentence.  We agree with Mr. Anderson's challenge to an unconstitutionally vague gang-related community custody condition and remand for resentencing so that the court can either clarify the

condition or strike it. The trial court can correct two scrivener's errors conceded by the State and conduct a *Blazina*[1] inquiry at the same time.

We reject seven challenges to Mr. Anderson's convictions that he raises in a pro se statement of additional grounds. The convictions are affirmed.

FACTS AND PROCEDURAL BACKGROUND

On November 18, 2014, law enforcement responded to a report of a shooting in Pasco, Washington. Four men had been sitting in a car when two men opened fire at the occupants. All four occupants were hit by the gunshots. One of the occupants yelled, "I think that was Shawn," during the shooting. Report of Proceedings (RP) at 1030. Investigation revealed the occupants in the car to be Florencia-13 gang members.[2] Mr. Anderson quickly become a suspect in the November 18 shooting but could not be located by police.

The next day, apparently in retaliation for the shooting, three men attacked a location that Mr. Anderson and his associates often visited. During this attack, Mr. Anderson's cousin was shot and injured. One of Mr. Anderson's friends, Anthony Guerrero, was shot and killed.

---

[1] *State v. Blazina*, 182 Wn.2d 827, 344 P.3d 680 (2015).
[2] At trial, the State did not offer evidence to the jury that Mr. Anderson had a gang affiliation, although it offered evidence of the gang affiliation of other individuals. It contended outside the presence of the jury that Mr. Anderson was a gang member.

Two weeks later, on December 3, Pasco law enforcement responded to the shooting of Lorenzo "Ritchie" Fernandez in front of the Stonegate Apartments. He had been fatally shot inside his car and was pronounced dead within 45 minutes of the officers' arrival at the scene. Like the victims of the first shooting, Mr. Fernandez was associated with the Florencia-13 gang. A witness saw two men jump the fence at the apartment complex immediately after shots were fired and run from the scene. One was carrying a pistol. Within a week, Mr. Anderson had become a suspect in Mr. Fernandez's shooting. He was located and arrested on December 11.

On December 12, Mr. Anderson's pregnant girlfriend was allowed to visit him at jail. After that meeting, Mr. Anderson asked to speak to law enforcement. In a recorded interview led by Detective Anthony Aceves, Mr. Anderson admitted that he had committed the November 18 shooting and had shot Mr. Fernandez on December 3.

Mr. Anderson told Detective Aceves that he committed the November 18 shooting following longstanding problems with the four victims, who he ran into at the Crazy Moose Casino in Pasco on the night of the shooting. He told the detective that he liked to street fight and had "never lost, and I don't stop," but that the gang members carried guns, forcing him to "run and then fucking hope I don't get shot." Ex. 71 at 9. He said he had been shot at by Florencia-13 gang members seven times, and gang members had hit his brother in the head with a brick. He told Detective Aceves that he was "tired of

3

this motherfucker cheesing on me everywhere I go.  Just laughing about the shit like it's funny because I don't shoot."  Ex. 71 at 9.

A female friend of Mr. Anderson's later testified that he sent her a text message the night of November 18 asking her to pick him up from the casino, which she did.  She testified that Mr. Anderson got into her car angry, telling her he had "issues inside" and that the four men had "laughed at him."  RP at 930.  Video footage from the casino from the night of shooting was later admitted at trial and showed the four men present at the casino at the same time as Mr. Anderson, but it revealed no verbal or other confrontation.  In closing argument, though, the prosecutor told jurors, "[I]f you look at the surveillance photo here, you can see in the grainy footage just the hint of a bit of a smirk on the face of Tapia Torres. . . .  [S]o there's no issue of a physical or verbal altercation that night.  It's really about this look and the idea in the defendant's mind the idea that pricked his ego that he was being laughed at, that he was being disrespected."  RP at 1501.

Mr. Anderson told Detective Aceves that he later killed Mr. Fernandez because Mr. Fernandez was associated with the Florencia-13 gang and he wanted to get back at them for what they did to Anthony Guerrero.  He claimed he called Mr. Fernandez, pretended to be someone from Mr. Fernandez's "hood," and arranged for them to meet in front of the Stonegate Apartments.  Ex. 71 at 35-36.  Mr. Anderson said he waited about 10 minutes for Mr. Fernandez to show up before he shot him.  Other evidence placed Mr.

Anderson at the scene but suggested that he had his cousin's wife contact Mr. Fernandez, and that Mr. Fernandez had traveled to the Stonegate Apartments thinking he was picking up a girl.

The State initially charged Mr. Anderson with one count of first degree murder and four counts of first degree assault. It later amended the charges to include two counts of unlawful possession of a firearm.

The jury found Mr. Anderson guilty as charged. It returned special verdicts finding that Mr. Anderson was armed with a firearm at the time of each assault and the murder.

At sentencing, defense counsel asked the court to "recognize that Mr. Anderson was very young at the time, barely an adult in this matter. He's ultimately going to spend the rest of his life in prison. We ask the Court take that into consideration in sentencing him." RP at 1579. In announcing Mr. Anderson's sentence the trial court made no mention of his age, however. Instead, the court emphasized the premeditated and wholly unjustified character of Mr. Anderson's actions. The court commented that surveillance video from the casino showed that Mr. Anderson's victims "did absolutely nothing to Mr. Anderson on November 18"; as for Mr. Fernandez, he did nothing more than be "labeled part of a group seen as an enemy." RP at 1584. The court stated that the killing of Mr. Fernandez "wasn't a gunfight. It was an execution." RP at 1586.

The court explicitly stated that there was no reason warranting a downward departure. It imposed a midrange sentence, with a total period of confinement of 1,126 months, or 93 years and 10 months. Mr. Anderson appeals.

ANALYSIS

I.     THE TRIAL COURT DID NOT MISAPPREHEND ITS AUTHORITY TO IMPOSE AN EXCEPTIONAL SENTENCE AND INEFFECTIVE ASSISTANCE OF COUNSEL IS NOT SHOWN

Mr. Anderson contends the trial court abused its discretion by failing to apply current Washington case law and consider youth as a mitigating factor. Alternatively, he contends his trial lawyer was ineffective for failing to argue for an exceptional mitigated sentence.

A defendant generally cannot appeal a standard range sentence. RCW 9.94A.585(1); *State v. Williams*, 149 Wn.2d 143, 146, 65 P.3d 1214 (2003). He can appeal a failure by the sentencing court "to comply with procedural requirements of the [Sentencing Reform Act of 1981, chapter 9.94A RCW,] or constitutional requirements." *State v. Osman*, 157 Wn.2d 474, 481-82, 139 P.3d 334 (2006); RCW 9.94A.585(2). Where a defendant appeals a sentencing court's failure to consider a request for an exceptional sentence, "review is limited to circumstances where the court has refused to exercise discretion at all or has relied on an impermissible basis for refusing to impose an

6

exceptional sentence below the standard range." *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997).

Under RCW 9.94A.535(1), a court may impose an exceptional sentence below the standard range "if it finds that mitigating circumstances are established by a preponderance of the evidence." In *State v. O'Dell*, 183 Wn.2d 680, 695-96, 358 P.3d 359 (2015) our Supreme Court made clear that while youth is not a per se mitigating factor, a defendant's youth can justify an exceptional sentence below the standard range. In so holding, it disavowed the reasoning of prior case law to the extent it was inconsistent. *Id.* at 696. The court remanded O'Dell's case for resentencing because "the trial court clearly believed that [it was] absolutely prohibited . . . from considering whether youth diminished [the defendant's] capacity to appreciate the wrongfulness of his conduct or conform that conduct to the requirements of the law." *Id.*

Mr. Anderson contends that his sentencing suffered from the same infirmity, with "[t]he trial court erroneously believ[ing] it had no discretion to depart from the standard range." Br. of Appellant at 7. But the record does not support that contention. No one argued at sentencing that the court could not consider Mr. Anderson's youth as a mitigating factor. Mr. Anderson's lawyer argued that he "was very young at the time, barely an adult." RP at 1579. The trial court directly addressed the exceptional sentence option, stating that it had no *reason* to deviate from the standard range, not that it lacked

the *legal ability* to do so.  *See* RP at 1585 (stating that Mr. Anderson would get a standard range sentence "[a]bsent a reason to depart, and here there is none").  The court explained its sentence as warranted by the premeditated and wholly unjustified nature of Mr. Anderson's actions.

Mr. Anderson also asserts conclusorily that his trial lawyer provided ineffective representation by failing to raise *O'Dell* and the related case law recognizing a connection between youth and decreased moral culpability for criminal conduct.  But he fails to present any analysis of the two showings required for an ineffective assistance claim.[3]  *See* Br. of Appellant at 13.  Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration.  *Holland v. City of Tacoma*, 90 Wn. App 533, 538, 954 P.2d 290 (1998); RAP 10.3(a)(6).

II.     THE GANG-RELATED COMMUNITY CUSTODY CONDITION IMPOSED BY THE COURT IS
        UNCONSTITUTIONALLY VAGUE IN ITS PRESENT FORM

Mr. Anderson next argues that the trial court violated due process when it imposed an unconstitutionally vague crime-related prohibition as a community custody condition. The challenged condition requires that Mr. Anderson not possess "gang paraphernalia

---

[3] To demonstrate ineffective assistance of counsel, a defendant must show two things: "(1) defense counsel's representation was deficient, i.e., it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, i.e., there is a reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different."  *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (emphasis omitted).

including clothing, insignia, medallions, etc." Clerk's Papers (CP) at 142. Although Mr.

Anderson did not object to the condition at sentencing, challenges to community custody

conditions as illegal or erroneous may be made for the first time on appeal. *State v. Bahl*,

164 Wn.2d 739, 744, 193 P.3d 678 (2008).

"Sentencing conditions must adequately inform the offender of what conduct they

either require or proscribe; failure to provide sufficient clarity runs afoul of the due

process protection against vagueness." *State v. Villano*, 166 Wn. App. 142, 143, 272

P.3d 255 (2012). This court found that a condition similar to that challenged here was

unconstitutionally vague in S*tate v. Weatherwax*, 193 Wn. App. 667, 677-78, 376 P.3d

1150 (2016), *rev'd in part on other grounds*, 188 Wn.2d 139, 392 P.3d 1054 (2017). In

*Weatherwax*, the challenged condition was that "the defendant shall not wear clothing,

insignia, medallions, etc., which are indicative of gang lifestyle. Furthermore, that the

defendant shall not obtain any new or additional tattoos indicative of gang lifestyle." *Id.*

at 676 (internal quotation marks omitted).

*Weatherwax* discussed Washington and federal cases holding that general

prohibitions of gang-related clothing or paraphernalia are unconstitutionally vague, but

that a crime-related prohibition specific to a gang with which a defendant is associated

might not be. As explained by the federal circuit court in *United States v. Soltero*, 510

F.3d 858, 865-66 (9th Cir. 2007), in which a member of the Delhi gang appealed a

9

condition forbidding him to wear or display Delhi paraphernalia, the district court was entitled to presume that the defendant would be familiar with his own gang's paraphernalia.

As we did in *Weatherwax*, we remand for resentencing with directions that the gang-related condition be stricken or clarified.

III.     MR. ANDERSON IDENTIFIES AND THE STATE CONCEDES TWO SCRIVENER'S ERRORS IN THE JUDGMENT AND SENTENCE

Mr. Anderson next assigns error to two related scrivener's errors in the judgment and sentence. The first is language on the second page, checked as applying, which states, "A special verdict/finding returned/entered that the defendant used firearm in the commission of Counts I, II, III, IV and V." CP at 133 (boldface omitted). The second is language on page 7a, also checked as applying, which states, "The confinement time on Counts I, II, III, IV, and V includes 60 months as enhancement for [X] firearm." CP at 140. In fact, the jury was not asked nor did it find use of a firearm in connection with count II, which charged Mr. Anderson with first degree unlawful possession of a firearm. The confinement time for that count did not include a 60-month enhancement.

The State concedes the error. At resentencing, the court is directed to strike or exclude count "II" from the language in each case.

IV.     SINCE WE REMAND FOR RESENTENCING, MR. ANDERSON'S ABILITY TO PAY DISCRETIONARY LEGAL FINANCIAL OBLIGATIONS (LFOS) MAY BE ADDRESSED AT THAT TIME

10

Finally, Mr. Anderson argues that the trial court did not conduct the required *Blazina* inquiry into his current and likely future ability to pay discretionary LFOs and that his counsel provided ineffective assistance by failing to challenge his ability to pay.

During sentencing, the court's only inquiry into Mr. Anderson's current or future ability to pay LFOs was to ask defense counsel's "position on [his] ability to pay costs and fines and fees." RP at 1583. Defense counsel responded:

> Your Honor, my client has the ability to work at this point in time. I always tell the Court when we have these types of cases I don't know what his ability, his future ability will be, so we'll have to address that at some point in time. Obviously if he's going to prison, he won't be working per se.

RP at 1583-84.

The court imposed LFOs totaling $11,203.01, with restitution to be determined. Of that sum, $10,403.01 were discretionary costs including a $250.00 jury demand fee, $700.00 for a court appointed attorney, a $500.00 fine, and $8,953.01 for a court appointed defense expert and other defense costs. Defense counsel did not object.

Since we remand for resentencing, a *Blazina* inquiry can be conducted and Mr. Anderson may raise whatever objections he has to any discretionary LFOs imposed.

STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Anderson raises seven. They can be consolidated into four contentions: (1) that Mr. Anderson's confession was

11

involuntary, false, and not independently corroborated, (2) juror misconduct, (3) a

violation of his speedy trial right, and (4) ineffective assistance of counsel.

*Involuntary, false, and uncorroborated confession.*  Mr. Anderson contends that

his confession was improperly admitted at trial because it was involuntary and

uncorroborated.  The State presented ample corroboration.

Mr. Anderson does not explain why we should conclude that his confession was

involuntary.  The trial court ruled the statement to be voluntary and admissible following

a CrR 3.5 hearing and entered findings and conclusions explaining its ruling.  Mr.

Anderson does not assign error to any of the findings.  His SAG does not sufficiently

inform us of the nature of the claimed error.  *See* RAP 10.10(c).

Mr. Anderson also argues that his confession was clearly false because the

evidence at trial showed that someone named Andres Alegria actually committed the

crimes.  A forensic scientist in the DNA[4] section of the Washington State Patrol Crime

Laboratory testified at trial that one ammunition magazine provided for her analysis bore

DNA that, when run through CODIS,[5] was a match with an individual named Andres

Alegria.  Law enforcement testified that they unsuccessfully tried to track down Mr.

Alegria.

---

[4] Deoxyribonucleic acid.
[5] Combined DNA Index System.

During closing argument, Mr. Anderson's trial lawyer argued that the DNA evidence and law enforcement's failure to make contact or question Mr. Alegria called Mr. Anderson's guilt into question. The prosecution responded that the DNA result was unsurprising because the 9 mm pistol used to shoot Mr. Fernandez had reportedly been purchased earlier that day from an acquaintance of an acquaintance, "[s]o it would make sense that somebody else's DNA was on it." RP at 1547.

The State presented substantial evidence linking Mr. Anderson to the crimes. Whether his confession was true or false was a question for the jury.

*Juror misconduct.* Mr. Anderson argues his convictions should be reversed on account of misconduct by jurors 6 and 13.

During trial, the local newspaper ran a story about the trial that included a front-page picture of Mr. Anderson's handcuffs being removed in the courtroom. While the defense argued that the publication warranted a mistrial and change of venue, the trial court instead questioned jurors individually about whether they had seen the newspaper. Juror 6 admitted that he saw the photo briefly while buying coffee that morning. He said he could still be impartial and that seeing the photo did not affect his view of Mr. Anderson. Asked if he remembered anything about the photo, juror 6 said he "just [saw] the defendant standing up and part maybe of the defense attorney, the back of her head or something, and that's all [he] remember[ed] seeing." RP at 604.

13

Shortly after that issue was raised, the prosecutor brought it to the trial court's

attention that a testifying detective recognized juror 13. Juror 13 was brought in for

examination. She said she did know the testifying detective and had indicated as much

on her witness list form. Upon examination by defense counsel, juror 13 indicated that

she would "give [the detective's testimony] the same weight [she] g[a]ve everybody

else's testimony" and that she could still be fair and impartial. RP at 614.

A trial judge has broad discretion to conduct an investigation of jury problems and

may investigate accusations of juror misconduct in the manner most appropriate for a

particular case. *State v. Elmore*, 155 Wn.2d 758, 773-75, 123 P.3d 72 (2005). The court

need not follow any specific format. *State v. Jorden*, 103 Wn. App. 221, 229, 11 P.3d

866 (2000). Additionally, "[t]he decision of the trial court will be overturned on appeal

only for an abuse of discretion. If misconduct is found, great deference is due the trial

court's determination that no prejudice occurred." *Richards v. Overlake Hosp. Med. Ctr.*,

59 Wn. App. 266, 271, 796 P.2d 737 (1990) (citations omitted). The trial court did not

abuse its discretion in finding that there was no juror misconduct or prejudice to Mr.

Anderson.

*Speedy trial right violation.* Mr. Anderson asserts that his speedy trial rights were

violated. But on September 8, 2015, Mr. Anderson signed a waiver of speedy trial rights

and told the trial court that he understood he was waiving that right. RP (Sept. 8, 2015) at 4-5. No error is shown.

*Ineffective assistance of counsel, including conflict of interest.* Finally, Mr. Anderson argues his counsel was ineffective for failing to meet and confer with him, lying to the trial court about the amount of time spent with him, and failing to raise requested issues with the trial court. Because these complaints are almost entirely based on facts outside the record, Mr. Anderson's remedy is to present any supporting evidence in a personal restraint petition. *State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159 (1991).

We affirm Mr. Anderson's convictions and remand for resentencing. The issue of costs on appeal will be addressed by our commissioner.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, A.C.J.

15