IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No.  35775-9-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| JUSTIN C. LEWIS, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Justin Lewis challenges the sufficiency of evidence to support his conviction for first degree assault.  It is undisputed that Mr. Lewis was present when his cousin, David Rickman, struck Michael Evans with a table leg repurposed to serve as a bludgeon.  Viewed in the light most favorable to the State, the evidence demonstrated that Mr. Lewis participated in the assault as an accomplice.

Because the evidence was sufficient and Mr. Lewis raises no viable challenge in a statement of additional grounds, we affirm the conviction.  We grant Mr. Lewis's motion challenging the trial court's imposition of criminal filing and DNA[1] collection fees, and remand with directions to strike them.

---

[1] Deoxyribonucleic acid.

## FACTS AND PROCEDURAL BACKGROUND

On an evening in the spring of 2017, a female acquaintance of Michael Evans expressed interest in buying hydrocodone he had offered to obtain. She said she would send her friend, Justin Lewis, to pick up Mr. Evans at the Albertson's store in Clarkston.

Mr. Lewis arrived at the grocery store as arranged, and Mr. Evans told him that they needed to go to an apartment complex in Lewiston Orchards, where he would pick up the drugs. Mr. Lewis said he needed to stop at his place quickly first. He drove to his apartment and went inside while Mr. Evans waited in the truck.

While Mr. Evans waited, a man he did not know but who turned out to be Mr. Lewis's cousin, David Rickman, walked out toward the truck and spoke to Mr. Evans. Mr. Evans's and Mr. Lewis's versions of what happened next diverge.

Mr. Evan's version of events is that Mr. Rickman noticed he was holding electrical tape and asked for some, which Mr. Evans provided.[2] Mr. Rickman then walked to the back of the truck, where Mr. Evans heard him talking to someone. He assumed it was Mr. Lewis, who came back out to the truck shortly after Mr. Rickman. Mr. Lewis then walked to the front passenger door where Mr. Evans was sitting sideways, with the door open. Mr. Lewis was holding what appeared to Mr. Evans to be

---

[2] Both counsel asked at trial why Mr. Evans was carrying electrical tape. Mr. Evans had no explanation other than that it is useful.

2

a handgun (it turned out to be a BB gun) and began asking him accusatory questions about the night before, when Mr. Evans had shared some heroin with Michelle Curran, Mr. Lewis's girlfriend. It is not clear what Mr. Lewis's questions implied, but Mr. Evans objected, telling him, "You've got this wrong." Report of Proceedings (RP) at 167.

As Mr. Evans sought to placate Mr. Lewis, Mr. Rickman had walked to and opened the truck's driver's side door. He reached in and struck the back of Mr. Evans's head with a wooden table leg, to the end of which (using electrical tape) he had attached a large hex nut bolt. After he was struck a couple of times, Mr. Evans believes (but is not sure) that Mr. Lewis grabbed him, pulled him out of the truck, and threw him to the ground. He claims Mr. Lewis and Mr. Rickman continued to kick and beat him while he was on the ground, telling him to give them his "stuff," which he assumed meant his drugs. RP at 169. He was carrying heroin. The two men finally stopped when Ms. Curran, who Mr. Evans was unaware had arrived at the scene, said, "Hey, that's enough." RP at 170. Seeing Ms. Curran, Mr. Evans pleaded with her to tell the men he had not done anything. When it appeared she was not going to say anything to help him, he fled.

He first hid in a field and then sought help at a home in the area, whose owners let him in and called police. Mr. Evans lied to the responding deputy sheriff, Deputy Nathan Conley, telling him he was walking down the street when he was jumped by two

3

unknown men.[3] (He later explained that he lied because he was carrying heroin and did not want to admit the drug involvement.) That night, however, he provided Deputy Conley with a description of the men and of the brown and black backpack he claimed they had taken, which bore the letters "FUL" across the front. He also told the deputy that after being chased and hiding, he observed a white Chevrolet pickup truck going up and down the road that he believed was involved. While being interviewed by Deputy Conley, medics evaluated Mr. Evans, and asked to transport him to a hospital. He declined the ambulance transport, later explaining that he could not afford it.

Information provided by Mr. Evans was enough to enable a patrol deputy to locate Mr. Lewis's truck and pull it over. The patrol deputy observed a backpack in the truck that met Mr. Evans's description. When asked about the backpack, Mr. Lewis told the patrol deputy it was his. He claimed to know nothing about any assault or attempted robbery.

The patrol deputy arranged for Deputy Conley to transport Mr. Evans for a field showup. When Mr. Evans identified Mr. Lewis as one of his attackers and identified the backpack, the patrol deputy placed Mr. Lewis under arrest. In a search incident to arrest, he recovered drug paraphernalia that proved to contain residue. He did not find Mr. Lewis to be carrying any cash.

---

[3] In a conversation with the deputy sheriff the next day, Mr. Evans admitted lying, that a planned drug exchange had led to the assault, and that he knew Mr. Lewis.

Mr. Lewis consented to Deputy Conley's search of his truck, during which the deputy located Mr. Evans's wallet and cell phone. In a search of the bed of the truck, the deputy found the modified table leg and showed it to Mr. Evans. Mr. Evans expressed his belief that it was the weapon used in the assault. The deputy sheriff also noticed blood on Mr. Lewis's shirt and arranged for it to be taken into evidence once Mr. Lewis arrived at the jail. DNA in the blood stain on the shirt later proved to be a match for Mr. Evans. A BB pistol was later found in the passenger compartment of the truck.

The deputy sheriff read Mr. Lewis *Miranda*[4] warnings and Mr. Lewis agreed to speak. When asked generally about his activities that evening, he described taking friends to Walmart and going to his mother's house, but made no mention of any assault or robbery. When asked more pointedly about a robbery or assault, Mr. Lewis said he saw two men assaulting another man, but he was not involved. Asked why, if he was not involved, he had the victim's backpack and property, Mr. Lewis said he did not know. The deputy sheriff later described Mr. Lewis as appearing to be "under some sort of influence" during the questioning. RP at 66.

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

Later in the evening, on the advice of the deputy sheriff, Mr. Evans went to the emergency room. He had a wound on the back of his head that was open and bleeding, a hematoma on his side, a fractured hip, and a broken pelvis.

Mr. Lewis was charged with first degree assault, first degree robbery, possession of a controlled substance, and possession of drug paraphernalia. Deadly weapon enhancements were charged in connection with the first two counts.

At trial, the State presented evidence of all of the foregoing matters. Mr. Lewis testified in his own defense. His version of events was largely consistent with Mr. Evans's up to the point where Mr. Lewis returned to the truck from his apartment and began questioning Mr. Evans. Mr. Lewis said he merely asked Mr. Evans "what might have happened that night before . . . just to get clarification." RP at 243. He testified that he never pulled Mr. Evans out of the truck, and that Mr. Evans got out on his own after being struck two times by Mr. Rickman. He testified that Mr. Evans was "actually knocked out" by Mr. Rickman's blows, and that it was he who stopped Mr. Rickman's attack by telling him, "That's enough." RP at 245. He denied ever striking or kicking Mr. Evans and testified that he tried to help him. According to him, when Mr. Evans regained consciousness he started "swinging everywhere" and hit Ms. Curran, who had approached the truck. RP at 244.

Mr. Lewis testified he took nothing from Mr. Evans that night. Instead, when Mr. Evans fled, he left his belongings behind. He claimed the assault on Mr. Evans was

6

committed by Mr. Rickman alone. The only explanation he offered for Mr. Rickman's actions was that his cousin "has a very—temper when he—when he's high." RP at 261.

The jury found Mr. Lewis guilty of all counts and returned special verdicts that Mr. Lewis or an accomplice was armed with a deadly weapon during the assault and the robbery. Mr. Lewis appeals.

## ANALYSIS

Mr. Lewis makes one assignment of error to the sufficiency of the evidence to prove he was guilty of first degree assault as a principal, and another to whether the evidence was sufficient to prove him guilty of first degree assault as an accomplice. The jury was instructed on accomplice accountability and could have found Mr. Lewis guilty as a principal or accomplice. We need not examine whether the evidence was sufficient to prove both.

First degree assault was charged under RCW 9A.36.011(1)(a). The to-convict instruction set forth the essential elements the State was required to prove:

> To convict the Defendant of the crime of Assault in the First Degree as charged in Count 1, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about the 4th day of April 2017, the Defendant or an accomplice assaulted Michael Evans;
> (2) That the assault was committed with a deadly weapon or by a force or means likely to produce great bodily harm or death;
> (3) That the Defendant or the accomplice acted with intent to inflict great bodily harm; and

> (4) That the acts occurred in Asotin County, the State of
> Washington.

Clerk's Papers (CP) at 27. Mr. Lewis argues that the evidence was insufficient to prove the second and third elements of the instruction beyond a reasonable doubt.

The standard of review for a defendant's challenge to the sufficiency of the evidence requires us to view the evidence in the light most favorable to the State and determine "whether any rational trier of fact could have found the elements of the charged crime beyond a reasonable doubt." *State v. Brown*, 162 Wn.2d 422, 428, 173 P.3d 245 (2007). "A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). "In determining the sufficiency of the evidence, circumstantial evidence is not to be considered any less reliable than direct evidence." *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). This court defers to the fact finder on issues of witness credibility and persuasiveness of the evidence. *State v. Thomas*, 150 Wn.2d 821, 874-75, 83 P.3d 970 (2004), *aff'd*, 166 Wn.2d 380, 208 P.3d 1107 (2009).

I.    THE EVIDENCE WAS SUFFICIENT TO PROVE USE OF A DEADLY WEAPON

In connection with the second element—that the assault was committed with a deadly weapon or by a force or means likely to produce great bodily harm or death—the

State's theory was that the repurposed table leg wielded by Mr. Rickman was a deadly weapon.

Jurors were instructed that "deadly weapon" means

any weapon, device, instrument, substance, or article, which under the circumstances in which it is used, attempted to be used, or threatened to be used, is readily capable of causing death or substantial bodily harm.

CP at 31 (Instruction 9). The circumstances of a weapon's use include the intent and present ability of the use, the degree of force, the part of the body to which it was applied, and the physical injuries inflicted. *State v. Winings*, 126 Wn. App. 75, 88, 107 P.3d 141 (2005).

The table leg was used by Mr. Rickman to strike Mr. Evans in the head. Even Mr. Lewis admitted that it was a "serious weapon" with "a lot of heft." RP at 251-52. The leg was admitted into evidence, and in closing argument, the State encouraged jurors to examine it:

[L]adies and gentlemen of the jury, pick this thing up. You'll go back— you'll get—get to take this back with you. Pick it up. Feel the heft. Feel the weight on the end. Think about the damage that could be done to a person's skull, striking them with this—this—this implement.

RP at 316.

In its own closing argument, the defense did not contest the characterization of the table leg as a deadly weapon. It admitted that evidence Mr. Evans was struck twice in the back of the head with the table leg "is consistent with what you saw in the pictures.

9

Clearly he was struck." RP at 330. The defense told jurors that "Mr. Rickman did indeed

attack Mr. Evans." RP at 331. The defense challenged only whether the State had

proved that Mr. Lewis participated in the assault as a principal or as Mr. Rickman's

accomplice. The State's evidence was sufficient to prove use of a deadly weapon.

II.     THE EVIDENCE WAS SUFFICIENT TO ESTABLISH THAT MR. LEWIS AND MR.
        RICKMAN ACTED IN CONCERT AND THAT ONE OR BOTH OF THEM ACTED WITH
        INTENT TO INFLICT GREAT BODILY HARM

Mr. Lewis makes a multifaceted challenge to the sufficiency of the State's

evidence to prove that acting as a principal or accomplice, he intended, in assaulting Mr.

Evans, to inflict great bodily harm.

First degree assault requires proof of specific intent, which is intent to produce a

specific result: in the case of first degree assault, to inflict great bodily harm. *State v.*

*Elmi*, 166 Wn.2d 209, 215, 207 P.3d 439 (2009). In determining intent, the "jury may

consider the manner in which the defendant exerted the force and the nature of the

victim's injuries to the extent that it reflects the amount or degree of force necessary to

cause the injury." *State v. Pierre*, 108 Wn. App. 378, 385, 31 P.3d 1207 (2001). While

specific intent may not be presumed, the jury may infer it "as a logical probability from

all the facts and circumstances." *State v. Wilson*, 125 Wn.2d 212, 217, 883 P.2d 320

(1994).

Mr. Lewis first argues the State failed to prove that Mr. Evans sustained great

bodily harm, which was defined for jurors as bodily injury "that creates a probability of

10

death or which causes significant, serious impairment, disfigurement or that causes a significant permanent loss or impairment of the function of any bodily part or organ." RP at 288. But the third element of the to-convict instruction required only proof that the defendant *intended* to inflict great bodily harm, not that such harm was inflicted, consistent with RCW 9A.36.011(1)(a).

Mr. Lewis next argues that the State's evidence was insufficient to prove even an intent to inflict great bodily harm. Two of his arguments can be rejected summarily: he contends there was no evidence of any plan to use the table leg as a weapon, and that Mr. Lewis stopped the attack by saying, "[T]hat's enough." RP at 170. Those arguments view the evidence in the light most favorable to Mr. Lewis, contrary to the standard of review. Direct evidence from Mr. Evans established that it was Ms. Curran, not Mr. Lewis, who uttered words that suspended the attack. And the attackers' opportunity to identify the table leg as a weapon, its modification, and Mr. Rickman's use of it is sufficient circumstantial evidence of a plan to use it as a weapon.

Mr. Lewis also argues there was not enough evidence of blood or physical evidence of a fight at the scene to prove the required intent. He also attaches significance to the fact that Mr. Evans was well enough to travel to a field showup before going to the hospital.

Using a bludgeon to strike someone's skull and kicking someone on the ground with enough force to fracture a hip, break a pelvis, and cause the discoloration and

11

swelling observed by Deputy Conley, could be found by a reasonable juror as evincing an intent to cause great bodily injury. And jurors could reasonably infer that Mr. Rickman and Mr. Lewis intended more harm than they inflicted, since Mr. Lewis was able to escape. The evidence was sufficient to prove the required specific intent.

Finally, Mr. Lewis challenges the sufficiency of the evidence to support his liability as an accomplice. Specifically, he argues that the State was required to prove his knowledge that Mr. Rickman intended to inflict great bodily harm. Br. of Appellant at 13.

A person is an accomplice to a crime if "with knowledge that it will promote or facilitate the commission of the crime, he or she . . . encourages . . . [another] person to commit [the crime] . . . or . . . [a]ids or agrees to aid another person in planning or committing [the crime]." RCW 9A.08.020(3). "[A] jury is not required to determine which participant acted as a principal and which participant acted as an accomplice." *In re Pers. Restraint of Hegney*, 138 Wn. App. 511, 524, 158 P.3d 1193 (2007). Contrary to Mr. Lewis's argument, the State was required to present evidence that Mr. Lewis acted on a plan to assault Mr. Evans—not that he foresaw that his and Mr. Rickman's actions would qualify as first degree assault. It is a longstanding rule that "an accomplice need not have specific knowledge of every element of the crime committed by the principal, provided that he, the accomplice, has general knowledge of that specific crime." *In re*

*Pers. Restraint of Sarausad*, 109 Wn. App. 824, 835, 39 P.3d 308 (2001). Where the charge is assault in the first or second degree,

> an accused . . . must have known generally that he was facilitating an assault, even if only a simple, misdemeanor level assault, and need not have known that the principal was going to use deadly force or that the principal was armed.

*Id*. at 836.

The evidence was more than sufficient to prove that Mr. Lewis acted as an accomplice. It included Mr. Evans's testimony that Mr. Lewis was one of his attackers, throwing him from the truck onto the ground, and kicking him.

Even if jurors believed that only Mr. Rickman had inflicted the physical harm, plenty of circumstantial evidence, viewed in the light most favorable to the State, supported the State's theory that Mr. Lewis enlisted his cousin's help to assault Mr. Evans and take his heroin. There was a detour to Mr. Lewis's apartment, where Mr. Rickman coincidentally appeared and approached Mr. Evans and the truck. Mr. Evans testified to his belief that Mr. Lewis and Mr. Rickman spoke together quietly before Mr. Rickman's attack. While Mr. Lewis distracted Mr. Evans with puzzling questioning, Mr. Rickman reached through the driver's side door to strike Mr. Lewis from behind with his repurposed weapon—an action for which the State's theory appeared to be the only plausible explanation. When stopped by police and questioned, Mr. Lewis falsely claimed that Mr. Evans's backpack was his and made inconsistent statements (although

continually false statements) about what he knew about an assault taking place earlier in the evening. The search incident to arrest revealed that Mr. Lewis was carrying no money, yet his reason for picking up Mr. Evans had ostensibly been to make a drug purchase. Mr. Lewis's version of events was full of holes. We defer to the jurors' decision not to believe him.

III.  WE GRANT MR. LEWIS'S MOTION TO REMAND WITH DIRECTIONS TO STRIKE TWO LEGAL FINANCIAL OBLIGATIONS (LFOS)

Relying on *State v. Ramirez*, 191 Wn.2d 732, 426 P.3d 714 (2018), which was decided after Mr. Lewis filed his opening brief, Mr. Lewis filed a motion to strike the criminal filing and DNA collection fees imposed in his judgment and sentence. *Ramirez* holds that amendments made in 2018 to Washington's legal financial obligation system, which provide relief to offenders in a number of respects, apply prospectively to cases on direct review. *Id.* at 749-50.

The 2018 amendments prohibit imposition of a $200 criminal filing fee on defendants who are indigent at the time of sentencing as defined by RCW 10.101.010(3)(a)-(c). RCW 36.18.020(2)(h). Mr. Lewis was found by the trial court to be indigent for purposes of appeal.

The amendments prohibit the assessment of a DNA database fee if the State has previously collected the defendant's DNA as a result of a prior conviction. RCW 43.43.7541. Mr. Lewis's criminal history reveals several prior felonies, on the basis of

14

which we will accept his contention that his DNA has been collected before. We grant

Mr. Lewis the relief requested by his motion and direct the trial court to strike the $200

filing fee and $100 DNA fee from his judgment and sentence.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Lewis raises two. He first

argues that the "county jail" had him wear an orange jail-issued shirt at trial. SAG at 1.

Several witnesses, when asked to identify Mr. Lewis in the courtroom, described him as

wearing an orange shirt. Two of them described him as wearing a blue or green shirt

over the orange shirt, however.

"'The State cannot, consistent with the rights guaranteed by the Fourteenth

Amendment, compel a defendant to stand trial before a jury dressed in jail attire

identifiable by a jury as such.'" *State v. Sanchez*, 122 Wn. App. 579, 587, 94 P.3d 384

(2004) (quoting *State v. Stevens*, 35 Wn. App. 68, 70, 665 P.2d 426 (1983)). Instances

arise where a defendant chooses to stand trial in prison garments, however, so "'[t]he

particular evil proscribed is compelling a defendant, against his will, to be tried in jail

attire.'" *Id*. (alteration in original) (quoting *Estelle v. Williams*, 425 U.S. 501, 508, 96 S.

Ct. 1691, 48 L. Ed. 2d 126 (1976)). Courts require an accused to object to being tried in

jail garments, "'just as he must invoke or abandon other rights.'" *Id*. If Mr. Lewis's

orange shirt was jail attire, he did not object that he was being required to wear it. The

issue was not preserved.

15

Mr. Lewis's second ground is that his trial lawyer failed to strike a juror despite Mr. Lewis telling the lawyer that the juror had done work at the county jail and would recognize him as an inmate. Nothing about this appears in the record. Because this court has no ability to assess this argument without a record, Mr. Lewis's remedy is to seek relief by personal restraint petition. *State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159 (1991). To prove ineffective assistance of counsel, he will need to demonstrate that his trial lawyer's representation was both deficient and prejudicial. *See State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995) (citing *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).

We affirm the assault conviction and remand with directions to strike the court's imposition of the criminal filing and DNA collection fees.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, A.C.J.

16