

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 37992-2-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BRIAN ANDREW GLASER, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Brian Glaser appeals his conviction for first degree murder. He assigns error to the trial court's refusal to suppress evidence for constitutional and rule violations he alleges were committed during law enforcement's investigation of his former employer's death. We find no error or abuse of discretion and affirm.

FACTS AND PROCEDURAL BACKGROUND

At around 5:00 p.m. on a summer afternoon in 2018, Donald Duckworth was found dead on a Bainbridge Island residential property, where he had been digging a well. Mr. Duckworth appeared to have been the victim of three gunshots.

Late that evening, Bainbridge Island Police Detective Erik Peffer requested a search warrant for three trucks located at the work site: a Ford 800 welding truck, a Mack

mobile drilling rig truck, and a Ford F-series pickup. A search warrant was granted for the three trucks and a 50-yard perimeter around them.

The next day, Detective Peffer made a telephonic application for two more search warrants. These, and a fourth application (discussed below) were sought from the same judge who had issued the first warrant. Successive warrant applications generally restated or incorporated information from earlier applications.

The second warrant sought was for authorization to search a cellphone found in one of the trucks. Detectives had determined that the phone was Mr. Duckworth's. The warrant was granted.

The third warrant sought was for a Nissan pickup truck located in a driveway on Eagle Harbor Drive. Among information supporting this search warrant was that officers had learned from interviews that Mr. Duckworth had recently had a falling out with Brian Glaser, one of his employees. Mr. Glaser reportedly claimed to have fallen from a work truck and filed a worker's compensation claim. Mr. Duckworth's wife told officers that her husband did not believe Mr. Glaser had suffered a work injury and was upset that he filed a claim. According to interviews, soon after the Department of Labor and Industries accepted the claim, Mr. Glaser walked off the job and told Mr. Duckworth he did not want to work for him anymore. After that, the relationship between the two men was reportedly volatile. Mr. Duckworth's son reported that his father was concerned about

Mr. Glaser's behavior, "describing him as quote, 'aggressive,' 'a loud mouth,' 'a quack,' and he felt he was crazy." Clerk's Papers (CP) at 263.

The identification of Mr. Glaser as a person of interest led detectives to determine that he was associated with the Nissan pickup truck they wished to search. Overnight, two officers had driven by Mr. Glaser's last known address—the Eagle Harbor Drive address—where they observed the pickup truck, which had what Detective Peffer described as a "very distinctive lift or crane in the back, which is typically used to lift engines from a vehicle's motor compartment[ ]." CP at 263-64. This corresponded to a report from a neighbor of the work site owner that she saw a pickup truck with a lift in the back at the worksite at around 1:30 p.m. on the day Mr. Duckworth was found shot. She said she saw three men speaking near the worksite, and the pickup truck with the lift was parked on the dirt road that provided access to the work site.

Detective Peffer also stated in his telephonic application for this third warrant that fingerprint evidence placed Mr. Glaser at the scene at or around the time of the homicide. The application stated that Detective Mike Grant of the Kitsap County Sheriff's Office had matched fingerprints Mr. Glaser submitted in connection with a concealed pistol license application to latent prints found on the welding truck. The detective explained that the prints on the truck were "clear[ly] . . . freshly placed" because they were clean, whereas the truck was otherwise covered with a thin film of dust from the drilling activity. CP at 267. Detective Peffer stated that based on the neighbor's sighting of a

3

truck similar to that associated with Mr. Glaser and the fingerprint evidence, there was

probable cause to believe that Mr. Glaser was on the scene at or around the time of the

homicide, and that Mr. Glaser had traveled there in the truck they wished to search.  The

judge granted this third search warrant.

That afternoon, officers located Mr. Glaser, arrested him, read him his *Miranda*[1]

rights and questioned him in a recorded interview.  Although Mr. Glaser indicated that he

understood his rights and answered a few questions, he raised his interest in having a

lawyer early in the interview:

> Det. Garland:  Okay.  And when was the last time you saw Don?
> Brian Glaser:  Um, I think I need a lawyer.
> Det. Garland:  You think you need a lawyer?
> Brian Glaser:  Yeah.
> Det. Garland:  Okay.  So are you asking to speak to an attorney before we go any further?
> Brian Glaser:  Yeah, I, what is this all about?

CP at 128.  After the detective answered that question and the men spoke a bit more

about "what this was all about," Mr. Glaser renewed questions about getting a lawyer and

the process to be followed once he had a lawyer.  Although Detective Garland answered

those questions, he continued to interrogate Mr. Glaser.

Detectives continued to question Mr. Glaser until 9:16 p.m.  They then took him to

his residence, intending to collect any items having evidentiary value.  Once a search

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

warrant was in hand, they entered and Mr. Glaser, who was still being questioned, led them to the living room. There he pointed out a backpack that contained the firearm he had used in the murder and a Carhartt jacket he had worn the day of the murder. He then took the detectives outside to a tree along the curtilage and showed them where he had buried 16 shell casings he collected from the murder scene.

After the shell casings and backpack were collected, one detective took Mr. Glaser to the police station while Detective Peffer remained at the home with two other detectives to finish executing the search warrant. King County Sheriff's Detective Sergeant Chad Birkenfeld took possession of the shell casings and the backpack, which he delivered to Detective Bowman of the Bainbridge Island Police Department for processing. Before leaving the home with those items, Detective Birkenfeld told Detective Peffer to make sure those items were included in the warrant inventory.

Detective Peffer completed inventory and receipt forms. Bremerton Police Detective Jason Butler was in the same room but did not look over the form, did not sign on the line provided for a witness, and did not check Detective Peffer's work for accuracy. The inventory form later proved to contain errors: it omitted the shell casings and backpack, and some items were insufficiently described.

Mr. Glaser was eventually charged with first degree murder with a firearm enhancement. In pretrial motions, he asked the trial court to suppress (among other evidence), items obtained pursuant to the search warrant for his truck, statements made

after he requested a lawyer, and the items collected when Mr. Glaser led officers through his home and to the buried shell casings.  The trial court agreed with several of Mr. Glaser's arguments.  It excised two statements in the affidavit in support of a search warrant for Mr. Glaser's truck that were attributed to insufficiently-identified speakers.  It agreed that when interviewed by Detective Garland, Mr. Glaser had clearly and unequivocally invoked his right to counsel and suppressed statements made to law enforcement thereafter.  Noting that detectives agreed they would not have found the shell casings had Mr. Glaser not pointed out their location, it suppressed them as fruits of the illegal interrogation.  Finally, it agreed that the officers' inventory of the search of the home violated CrR 2.3(d) in several respects.

The trial court nonetheless rejected Mr. Glaser's argument that affidavits that relied on Detective Grant's matching of the fingerprints inadequately described the detective's qualifications as a fingerprint examiner.  It concluded that untainted facts provided by the application for a warrant to search Mr. Glaser's home provided probable cause to issue the warrant, rejecting the defense argument that the tainted statements affected the magistrate's decision to issue the warrant.  It noted that the detectives agreed that the backpack in which the murder weapon was found was in a location in plain view that would have been observed and searched, so it would have been found without Mr. Glaser's assistance.  Finally, it concluded that because the violations of CrR 2.3(d) in

inventorying items collected in the search of the home did not prejudice Mr. Glaser, they did not provide a basis for suppressing the fruits of the search.

At the conclusion of a multi-week jury trial, Mr. Glaser was found guilty of first degree murder and was found to have been armed with a firearm during its commission. The trial court imposed a high-end standard range sentence. Mr. Glaser appeals. This Division Three panel considered the appeal without oral argument after receiving an administrative transfer from Division Two of this court.

## ANALYSIS

Mr. Glaser's assignments of error challenge the trial court's refusal to suppress much of the evidence that he contended below should be excluded on the basis of constitutional or rule violations. We first address his contention that the trial court erred when it found, applying the "independent source" exception to the exclusionary rule, that untainted evidence provided probable cause for the warrants to search his pickup truck and home. We then turn to his contention that evidence collected during the search of his home should have been excluded because officers violated inventory requirements imposed by CrR 2.3(d).

I.      UNTAINTED EVIDENCE SUPPORTED THE WARRANTS TO SEARCH MR. GLASER'S
        TRUCK AND HOME

The exclusionary rule generally requires that evidence obtained from an illegal search and seizure be suppressed. *State v. Betancourth*, 190 Wn.2d 357, 364, 413 P.3d

566 (2018) (citing *State v. Gaines*, 154 Wn.2d 711, 716-17, 116 P.3d 993 (2005)).  This

includes the initially seized evidence and any "fruit of the poisonous tree."  *Id.*; *Wong*

*Sun v. United States*, 371 U.S. 471, 484-85, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963).  An

exception, the "independent source exception," exists for evidence tainted by unlawful

governmental action "provided that it ultimately is obtained pursuant to a valid warrant or

other lawful means independent of the unlawful action."  *Gaines*, 154 Wn.2d at 718.  The

rationale for the rule is that the police should not be in a worse position than they

otherwise would have been in because of the error.  *Betancourth*, 190 Wn.2d at 365

(citing *Murray v. United States*, 487 U.S. 533, 537, 108 S. Ct. 2529, 101 L. Ed. 2d 472

(1988)).  To avoid suppression, the State must establish that absent the illegality it would

have still sought the warrant and the magistrate would have granted it.  *Id.*  "[T]he

inclusion of illegally obtained information in a warrant affidavit does not render the

warrant per se invalid, provided that the affidavit contains facts independent of the

illegally obtained information sufficient to give rise to probable cause."  *Gaines*, 154

Wn.2d at 718.

In challenging whether the applications to search his truck and home demonstrated

probable cause, Mr. Glaser renews an argument that the trial court should not have

considered information that Detective Grant had matched a fingerprint on the welding

truck to Mr. Glaser's prints.

A.      The trial court properly considered information that fingerprints found on the welding truck were a match to Mr. Glaser's prints

The first mention that a fingerprint on the welding truck tied Mr. Glaser to the murder scene was in the application for the warrant to search Mr. Glaser's truck. The transcript of the telephonic affidavit states:

> Detective Mike Grant with the Kitsap County Sheriff's Office—who has attended the scientific basic fingerprints course, 24 hours at the Biometric Technology Center of the FBI[2] in Clarksburg, West Virginia, 40 hours at the Michigan State forensic lab in Lansing, Michigan, and FBI advanced crime scene photography in Bremerton, Washington—had found some—what appeared to be fingerprints on the welding truck which was adjacent to where Donald's body was found. The prints were compared to Brian Glaser's fingerprints with—had obtained Brian Glaser's fingerprints because he had recently applied for a CPL[3] license with the Bainbridge Island Police Department. So Detective Mike Grant was able to use his training and experience and compare these fingerprints with Brian Glaser's fingerprints found on a truck—I'm sorry—was able to compare the fingerprints on the truck to Brian Glaser's fingerprints. And using the loops and the ridges, was able to find that it matched Brian Glaser's fingerprints. And we were able to place Brian at the scene that day.

CP at 264-65. Mr. Glaser argued in the trial court that when it comes to Detective Grant's *qualifications*, this testimony from Detective Peffer amounts to nothing more than information that Detective Grant "took an introductory ("Basics") class in fingerprint analysis, and a crime scene photography class"—training that "do[es] not qualify him to make a latent print identification." CP at 29. The trial court rejected the argument.

---

[2] Federal Bureau of Investigation.
[3] Concealed pistol license.

The burden is on the State to recite objective facts and circumstances which, if believed, would lead a neutral and detached person to conclude that more probably than not, evidence of a crime will be found if a search takes place. *In re Det. of Petersen*, 145 Wn.2d 789, 797, 42 P.3d 952 (2002); *State v. Neth*, 165 Wn.2d 177, 183, 196 P.3d 658 (2008) ("Probable cause for a search requires a nexus between criminal activity and the item to be seized and between that item and the place to be searched."). The determination of historical facts relevant to the establishment of probable cause is reviewed for abuse of discretion. *State v. Garcia-Salgado*, 170 Wn.2d 176, 183, 240 P.3d 153 (2010).

Whether a warrant affidavit's information constitutes probable cause is a question of law that we review de novo. *State v. Friedrich*, 4 Wn. App. 2d 945, 954, 425 P.3d 518 (2018) (citing *Neth*, 165 Wn.2d at 182). Nonetheless, because there is a strong preference for the warrant procedure, in determining that question of law, "'[g]reat deference is accorded the issuing magistrate's determination of probable cause.'" *Id.* (alteration in original) (quoting *State v. Cord*, 103 Wn.2d 361, 366, 693 P.2d 81 (1985)); *State v. Jackson*, 102 Wn.2d 432, 442, 688 P.2d 136 (1984) (strong preference for warrant procedure). If the propriety of issuing the warrant is debatable, the deference due the magistrate's decision will tip the balance in favor of upholding the warrant. *Id.* (citing *Jackson*, 102 Wn.2d at 446). In light of the deference owed the magistrate's

10

decision, the question on review is whether the magistrate could draw the connection, not whether he should do so. *Id.*

In reviewing a magistrate's determination of probable cause, we—like the magistrate—should not view the affidavit "'in a hypertechnical manner.'" *Id.* at 955 (quoting *State v. Riley*, 34 Wn. App. 529, 531, 663 P.2d 145 (1983)). "'[A] magistrate is entitled to draw reasonable inferences from the facts and circumstances set forth in the supporting affidavit,'" with the result that "'[r]easonableness is the key and common sense must be the ultimate yardstick.'" *Id.* (alterations in original) (quoting *Riley*, 34 Wn. App. at 531). "'Doubts concerning the existence of probable cause are generally resolved in favor of issuing the search warrant.'" *Id.* (quoting *State v. Vickers*, 148 Wn.2d 91, 108-09, 59 P.3d 58 (2002)).

A reasonable inference from the warrant application's statement that Detective Grant attended a basic fingerprint course as well as "24 hours at the Biometric Technology Center of the FBI" and "40 hours at the Michigan State forensic lab," CP at 265, is that the 64 hours of additional training at the FBI center and Michigan State included additional, relevant fingerprint training. The identification of that training in the warrant application implies as much. Both Detective Peffer and the issuing court would know that if the detective's affidavit misleadingly identified irrelevant training as relevant, the deception could be raised as the basis for a hearing under *Franks v. Delaware*, 438 U.S. 154, 155-56, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), to determine

11

whether the irrelevant training should be struck in assessing probable cause. *See State v. Garrison*, 118 Wn.2d 870, 872, 827 P.2d 1388 (1992) (the *Franks* test for striking material misrepresentations in assessing probable cause applies to allegations of material omissions). While Mr. Glaser raised a *Franks* challenge to other information provided by Detective Peffer's warrant applications, he did not raise a *Franks* challenge to the description of Detective Grant's training.[4]

Mr. Glaser does not demonstrate that the issuing magistrate could not have drawn the inference that Detective Grant's training qualified him as a fingerprint examiner.

B.      The telephonic application to search Mr. Glaser's home established probable cause

Mr. Glaser does not challenge the trial court's conclusion that investigating officers would have sought a warrant to search his home even if they had ceased their

---

[4] Testimony at trial demonstrated the relevance of the training. Asked at trial about his training and experience in fingerprint analysis, Detective Grant testified:

> A.      . . . I attended what's called "Scientific Basics of Fingerprints." It was at the biometric test center operated by the FBI in Clarksburg, West Virginia. It was a 24-hour class.
>      After that, I attended "Essential Ridgeology Concepts" by Ron Smith & Associates. That was in Lansing, Michigan, at the Michigan State Police Forensics Lab.
>      I also attended "Comprehensive Advanced Latent Print Comparison" in Raleigh, North Carolina. That was a 48-hour class.
>      I've also taken advanced FBI crime scene photography. I attended a simultaneous impression class at the Seattle Police Crime Lab last year.
>      I've taken various other FBI and Sirchie crime scene processing courses.

RP (Trial) at 397-98.

interrogation when he invoked his right to counsel.  Br. of Appellant at 9.  As explained

by the trial court, the question that remains under the independent source doctrine is

whether, "[i]f the interrogation of Brian Glaser had been terminated upon his request for

an attorney and a search warrant was sought based on the untainted facts available to law

enforcement at the time, there would have been probable cause to issue the warrant."  CP

at 635.  The court concluded:

> The nexus between the crime and the Defendant's house is that he lives
> there and returned home shortly after the homicide.  The untainted facts
> include motive, fingerprint evidence of the defendant's presence at the
> homicide scene, witness statements, and his parents' statements.  There is
> more than a mere suspicion articulated in the complaint for search warrant.

*Id.*

Mr. Glaser's identification of errors and issues and the organization of his opening

brief suggest that he challenges the trial court's refusal to suppress evidence collected in

searching his home on two independent grounds.  In substance, however, he places all of

his reliance on only one ground: his argument that the information about Detective

Grant's fingerprint match should not be considered and without that evidence, probable

cause was lacking.  Since we reject the argument that the fingerprint information should

not have been considered, no challenge under the independent source doctrine remains.

II.     VIOLATIONS OF CrR 2.3(d)'S INVENTORY REQUIREMENTS DO NOT SUPPORT THE
        REMEDY OF EXCLUDING EVIDENCE FOUND IN THE SEARCH OF MR. GLASER'S HOME

Mr. Glaser's remaining assignment of error is to the trial court's refusal to suppress evidence collected in the search of his home on the basis of violations of the inventory requirements of CrR 2.3(d).

CrR 2.3(d) sets out the requirements for inventorying items found during a search pursuant to a warrant.  As relevant here, it requires:

> The return shall be made promptly and shall be accompanied by a written inventory of any property taken.  The inventory shall be made in the presence of the person from whose possession or premises the property is taken, or in the presence of at least one person other than the officer.

CrR 2.3(d).

In *State v. Linder*, 190 Wn. App. 638, 646, 360 P.3d 906 (2015), this court reviewed the State's argument that generally a violation of CrR 2.3, which imposes only ministerial requirements, should not be a basis for suppressing evidence.  We observed that when this court and federal courts have determined that suppression of evidence *is* an appropriate remedy for a rule violation, the touchstone has been prejudice.  *Id.* at 649.  We noted that in cases relied on by the State,

> almost all of the searches were conducted in a manner that satisfied the purpose, if not the letter, of the procedure required by the rule.  In many cases, the violations could be cured after the fact.  As a result, no prejudice to a right of the defendant was demonstrated.

*Id.* at 651.

14

In Mr. Linder's case, the trial court granted the remedy of suppression because it found that no other remedy was adequate. *Id.* at 643. A closed box was taken from Mr. Linder upon arrest. He would not consent to its being opened. After a drug dog alerted to it, police applied for a search warrant. The warrant was obtained late at night, and "with literally no one else around," an officer opened the box and inventoried its contents. *Id.* at 652.

The trial court in *Linder* refused to find that the unwitnessed inventory was accurate. This court affirmed, holding that the violation would have been "nonprejudicial only if the trial court found the inventory to be accurate despite the violation and substantial evidence supported that finding (thus satisfying the purpose of the rule), or if the violation could be remedied after the fact." *Id.* at 651.

*Linder* is easily distinguished. Detective Peffer did not execute the search warrant and inventory the seized items "with literally no one else around." The trial court found that other officers did not participate in the inventory process in the way required by the rule, which would better insure the inventory's accuracy. But the warrant was executed by a team of officers, with the result that there were multiple witnesses able to identify items that were seized and thereby identify inaccuracies.

Mr. Glaser likens his case to Mr. Linder's because—just as the trial court observed in *Linder*—if he disputed that inventoried items were found in his home, it would be his word against the officers. That was an observation of the trial court in Mr. Linder's case,

but it was not the basis for this court's holding. If the right to suppression turned on whether a defendant's challenge to an inventoried item would be his word versus the word of police officers, it would be available anytime a violation of CrR 2.3(d) could be identified.

The *holding* in *Linder* is met here. This trial court was satisfied that the testimony of participating officers made it possible to distinguish the accurate substance of the inventory from its inaccuracies. Suppression was properly denied.

## STATEMENT OF ADDITIONAL GROUNDS

In a pro se statement of additional grounds (SAG), Mr. Glaser raises two.

First, he asserts he has diplomatic immunity and asks this court to help him by contacting a police officer to run his driver's license number or "badge #6666." SAG at 1. This fantastical claim, if supportable, depends on facts outside the appellate record. Relief is available only through a personal restraint petition. *See State v. Norman*, 61 Wn. App. 16, 27-28, 808 P.2d 1159 (1991).

Second, he asks us to "please verify 53645-5-II," a case number he believes belongs to someone else. SAG at 1. Case no. 53645-5-II is a correct case number for his appeal, but is the number assigned in Division Two, prior to its administrative transfer. Upon transfer, it became our case number 37992-2-III.

16

No. 37992-2-III
*State v. Glaser*


Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Fearing, J.